The next case is number 06-3127, Brett J. Wadoops against Department of the Air Force. Mr. Wadoops. Good morning. May it please the Court, my name is Trent J. Wadoops and I represent the appellant in this matter. This is an employment case and it arises out of Brett, the appellant's work at the Hale Air Force Base as a civilian employee. Hale Air Force Base is in the state of Utah. Brett was, the appellant was a mechanic. He had a single random drug test because he was in a TDP position. And after that, there was a requirement that he enter into a referral plan and then enter into a rehabilitation program. And that's really the rub of the endgame of this whole appeal. The endgame started with paragraph 37 of the drug plan. And the paragraph 37 says that the agency was entitled to remove the appellant from his position if it proved that he had refused to obtain counseling as set forth in a plan as required under the EO. The EO being the drug plan that was eventually prepared under authority of Congress. Now, so that's the endgame. We need to go back to the beginning. At the very beginning of this whole process, what needs to be done is the following. You have to have a referral plan. The referral plan is prepared by a person called a SOCO in the drug plan. Now, a SOCO is a guy who's going to be skilled in dealing with drug problems and addiction medicine. And the referral plan is going to have to be a full contract. The referral plan is going to tell the employee what he has to do, when he has to do it, how he has to do it, and where he has to do it. They can have an A, B, and C as long as each of these priorities are set forth so that the employee knows exactly what he has to do. And the SOCO is capable of doing that because he's skilled in that position. Or it could even be delegated out to a third-party administrator, such as Weber Human Services in this case. But when you go out to Weber Human Services, or if you do it in-house through the MSMCO or the alphabet soup of other people that are supposed to be in the Air Force to provide these services, you have to go through a certain process. Now, what happens is you have to go to a person who's licensed in mental health treatment and have a face-to-face interview with them. They apply the DSM-IV criteria. DSM-IV criteria is basically the diagnosis. That you're either a drunk or a heavy drunk or somewhere in between. And then they compare that with the ASAM criteria, the American Society of Addiction Medicine, match those up, and then that becomes the program that the employee is supposed to follow in order to obtain the rehabilitation. That's the endgame here, but we never had any of this endgame. This is the first step, I mean. The first step is to get to that identification of a program. And what we had here with the agency was mostly the use of indefinite objects. Well, he had to do it. He had to do the program. But there was no program ever identified. And the problem was because they never had anybody who could serve in the position of a SOCO. So if we apply the principles of breach of contract, which is essentially what we're talking about here, you have to have four elements to prove breach of contract. If the agency had wanted to prove breach of contract in order to obtain the remedy, which is removal. And the first is a contract, performance by the party whose performance is first in time, non-performance by the party whose second in time, and of course damages. But what we don't have here is the initial contract, the referral plan identified in the drug plan. It would say, you go here, you do this, you finish it by then. But didn't you go to the first session? No, that's called an intake session. What you do at the intake session is basically you go in, give them your name, who you are, why you're there, and most importantly, how you're going to pay for it. So they have to learn that stuff first, and then you have to come back for the diagnostic testing, and that has to be with a proper person. Now he went for the intake, and then he went back for a second time. But the only person that they had there for him to meet with at Weber Human Services was an intern who was not qualified to provide the diagnosis under the DSM-IV criteria or match that up with the ASAM criteria. So there was never any program identified. But, you know, you're throwing out all of these procedural niceties, shall we say. But stepping back from all of that, clearly there was a failed drug test. And he was punished for the failed drug test. But that triggered some further procedures. Correct. And you can't quibble with the fact that some rehabilitation program was necessary. We acknowledge that he had an obligation to enter into a rehabilitation program. And the fact of the matter is that he was given the names of some rehabilitation centers. And, I mean, you argue the niceties of all of this, but nonetheless he was given the names of some rehabilitation centers. He went to one, at least one session. Then he returned again for a second session and never showed up for anything after that. Well, what the evidence demonstrated in front of the AJA was that he showed up and that they were unable to help him. They were unable to identify any program for him.  Nonetheless, I mean, if I were in his shoes, and I had failed a drug test, and my job was on the line, and I knew I had to complete some rehabilitation program, and I was given the name, I would go and sign up. And it wouldn't matter to me whether they had a program for me or not. I would just go there and sit there and complete it. It's not that hard. There are two problems with that. One, it can create an incentive for the agency to enter into a heads-we-win, tails-we-flip-again sort of occasion. And the second problem is that this is really the dog has embarked. You don't have to do anything until they tell you what you have to do. And third, the only way there could be a justification for requiring the employee to go out and make those decisions is if there was some sort of delegation of authority. But if you agree that he has to go out and find his own program and decide on his own basis, does that carry with it an ability to make his own choices? And if that is the case, and if that's where the authority comes from, then he did complete the program because he decided that he finished up the program that they had, which is none. I mean, that's where that logic leads to in our opinion. I think the only thing he had to decide was whether he wanted to finish that program or not. It wasn't a program, Your Honor. It was a facility that provides many different programs, and all those different programs are established through the ASAM criteria. And so before you can have any program at all, you have to identify the program, and that is why they're supposed to have a SOCO, and that is why he is supposed to make that decision. Because once you delegate it to Brett, why can't he come in here and just say, I did complete the program because I went there, they didn't have anything else for me, therefore that's everything I have to do. Because if I have discretion and authority to decide for myself, then that's the decision I'm going to make. The agency wouldn't like that, and if we had made that decision, it would be a silly argument, but I think that's what the agency's argument would tend to require you to hold, is that he does have delegated authority, and then you'd have to figure out the scope of his delegated authority, the nature of his discretion, whether his discretion is broad, whether there's any remedy if he acts outside the scope of that discretion. And I think that just makes the procedure a hundred times more difficult. The key factor here is that there were regulations in place that he was entitled to rely upon, and those procedures that were in place that he was entitled to rely upon held that the agency first had to provide the guidance, so that he couldn't come back later and say, well, you didn't finish the right program, or you have to do more, or you're wasting your money. And they have to do that first, and it's not just a nicety. Yes, I agree that it would have been a better factual circumstance had we come here, but that would have been the way we would like things to go, but it doesn't take away from the fact that this is what the agency's obligation is. Before the agency can exercise its authority that it's been granted from Congress, it has to follow its own regulations. But are you arguing that the procedural infirmities left your client without notice of what his obligations would be? He had no notice. He had no ability to comply. Hold on, Counselor. You said he had no notice. I mean, he knew that he had to register in a rehabilitation program within five days and actually even filed a request for an extension to 14 days in order to find it. So it's kind of difficult to believe he had no notice when he, in fact, responded and asked for an extension of time to identify one. No, what that notice said, that was the notice of removal, the prior notice, and it said you have to give us notice within five days of the referral. The referral, if you go back to the drug plan, refers to the referral provided by the SOCO to the employee under the referral plan signed by both the SOCO and the employee, and then within five days of that he has to show that he signed up within five days. That's what that notice actually says. And we spent a bunch of time in front of the HA. She ultimately didn't decide anything with respect to it in her opinion, but that's what the notice actually says, and that's what it means, because you have to go back to the drug plan and say, if we're talking about a referral plan, what are we talking about? And otherwise, the agency, well, the law is clear. The agency cannot disregard its own obligations. It says give the employees a SOCO. It says let that SOCO decide, not give the discretion to the employee to decide, but the SOCO decides. He puts it forth in a plan. Then we apply the mirror image rule to what that plan says so that we can interpret it if there's a failure, and then at the end of the day the employee signs that, and so we know exactly what was meant here. We wouldn't have these problems if the agency followed its own procedures. But the failure of the agency to even provide any person like this to provide any guidance was the primary problem, because then we got in front of the HA, and she said, well, the supervisors don't have to do any more than this. We agree that the supervisors didn't have to do any more than they did. What the supervisor had to do was consult with the SOCO before it made any decision to remove the employees. If you look at the appendix attached to the agency's brief, there's a portion that talks about supervisors. They have to talk to the right people, the JAGs and the local agencies. The local agency here would have been the SOCO. Do you think he failed to finish the program? But that is not even getting to the fact that the agency just changed the standard. The standard is he must refuse to obtain counseling in a program under the EO, which imposes upon it the obligation to follow the EO, which means you have to give a referral, set up a referral plan, and then that is what he's held to, not the general statement that you have to do something sometime under some circumstances, but rather there must be specificity, and if there is not specificity, there is not proper notice, and the deprivation of proper notice is a deprivation of due process, right? And it resulted directly in the harmful error, which was his removal from service. And that's the primary point that the agency missed in front of the AJ, is it changed the standard. All of a sudden it was failure to complete instead of refusal to obtain. We all know that those are very different standards. Refuse is not synonymous with failure of care in some circumstances, but it's pretty clearly not here within the context of the drug plan, and there's no opportunity for the employee to know beyond that if the drug plan is not followed. Okay. Let's save your little time, Mr. Waddups. Thank you. Major Merrill. May it please the Court. The Merrill Systems Protection Board properly affirmed the removal of a drug user who said he was going to sight in his gun, come back to the workplace, and take care of business. Never mind the reasons. He wasn't removed for that. He was removed for failure to complete the rehabilitation. Yes, Your Honor. Let's talk about that. The referral plan, first of all, and the procedures that Mr. Waddups just addressed to you do not exist anywhere in the drug testing plan. What he has described to you in terms of what was supposed to have occurred in this case are not obligations imposed under the drug testing plan. And, in fact, this argument in terms of the referral plan and the procedures he alleges are supposed to exist were not even raised to the administrative judge. The issue raised to the administrative judge and to the board in his petition for review concerned whether or not he received a proper referral to a drug rehabilitation agency and whether or not he was properly monitored through the course of his rehabilitation. The administrative judge found, and the board sustained her finding, that he was, in fact, referred and that the agency met its obligations under the drug testing plan when he received notice to report to the Social Actions Office Employee Assistance Program, when he met with a military counselor who Mr. Waddups himself admitted was the military equivalent of the SACO he was supposed to see, who then provided him with references... Hold on. Counsel, the military counselor told him he could not help him directly because the appellate was a civilian, not a military person. And my understanding is he didn't actually refer him to any programs, but rather referred him to people who might refer him to programs. Your Honor, what the military officer did was gave him references that could be of help, on base as well as off base, and the on base reference he provided gave the name of the Davis Clinic as well as Weber Human Services. Mr. Waddups went to the Davis Clinic first and actually provided a business card to his supervisor, and the business card acknowledged that Davis had a program. However, the supervisor told him that wasn't sufficient proof of enrollment, at which point Mr. Waddups returned with a consent to release information demonstrating he had instead enrolled in the Weber program. The administrative judge considered the argument presented by Mr. Waddups as to whether a referral occurred and whether we had met our obligations under the drug testing plan. Her decision is supported by the substantial evidence in the record, and the Board properly sustained her finding of no harmful error. This argument concerning meeting licenses and DSM-IV diagnoses and that a program was supposed to have been created was also not raised before the administrative judge, which is why the Air Force moved to have that argument stricken from the reply brief. The contract law argument, which he just set forth as well, was not presented before the administrative judge either. Let's just consider the case before us. If, in fact, these are arguments that could change the result, perhaps it needs to go back to the Board. But let's just discuss the issues that are before us. Yes, Your Honor. The crux of the issue that the administrative judge considered, even though it had not properly been raised in the pre-hearing submissions, she still considered this argument of whether an affirmative defense should exist. She examined the plan, she heard the testimony of the witnesses, and she properly found, by substantial evidence, that the agency had met its obligations under the drug testing plan and that Mr. Wadoops had not demonstrated any harmful error. He knew his obligation from the day that he received the notice of a positive drug test for having tested positive at nearly 50 times the cutoff rate for methamphetamines. He had taken that test a mere 7 weeks after acknowledging that he was in a drug testing position as an aircraft worker. And he's a person who knew from having signed that acknowledgment... That issue is not before us, is it, as to whether he knew that he had tested positive? No, Your Honor. But the notice of positive drug test set forth the affirmative obligation he had to attend and complete a drug rehabilitation program. And contrary to Mr. Wadoops' argument, the agency standard in terms of what charge had been brought against Mr. Wadoops did not change in front of the judge or the Board. All along, the agency has charged Mr. Wadoops with failure to attend and complete a drug rehabilitation program. Mr. Wadoops was given choices, Your Honor. Was there somebody in place to monitor him in the course of his completion of this program? Because I understood the drug testing plan to create a SACO or SACO, I don't know if I'm saying it right, who would monitor and work with the appellant. And my understanding is no such person existed. Are you saying that Mr. Frost, his supervisor, was effectively doing the job of the SACO? Your Honor, yes. The drug testing plan provides the responsibilities of the SACO, and essentially a SACO serves as the conduit of information between the treatment facility and the supervisor. In this case, the supervisor is corresponding. He's not just the conduit of information between the treatment facility and the supervisor, right? He's supposed to be the person working closely with the appellant as well on ensuring he completes it. It's an appropriate program for him, all that. Am I wrong? No, Your Honor. Actually, the drug testing plan does not go into the detail of the relationship that the SACO is supposed to have. It actually says they serve as the initial point of contact in terms of getting them the necessary referral or reference to a drug treatment facility. But the plan says, and this is at Petitioner's Appendix, page 81, that the employee who uses illegal drugs is primarily responsible for changing their behavior. So while the Air Force is going to assist the employee with their drug problems, giving this opportunity to have a second chance with his employment, the actual obligation and responsibility ultimately rests with the employee in this case. And it's as if the drug testing plan envisioned the possibility that individuals were going to try and get out of disciplinary action by complaining about this referral process because the plan specifically says that any failure you feel occurred in this referral cannot be used as a defense to a disciplinary action taken against you. Did the Air Force comply with its own drug plan? Absolutely, Your Honor. Did you have a SACO? Did he meet with the fellow? He did not meet with Dr. Corder, who he was scheduled to meet with, but instead he met with a military appellant who did the intake assessment, a lengthy 200-plus questionnaire. He also went over that questionnaire with him. Mr. Waddups himself testified he had a lengthy discussion with this military counselor, and then he received the references and contacted the people who he had been provided. He then examined these two different programs, Davis and Weber. He chose to enroll in the Weber program. He then stopped going to his appointments after being told he may be removed from federal service for the comments that he had made, and he did not respond to Weber's request for possible further treatment. Weber contacted him in December and said, We haven't heard from you. If you are interested in continuing therapy, you need to let us know or we're going to discharge your case. After having been told in the notice of positive drug test, having been told when he was placed on administrative leave and in his first proposal to remove that he had this obligation to attend a complete rehabilitation, he knew what he had to do. He had provided proof of enrollment in a drug testing plan. He had not complained about any services that Weber had been providing with him, and he just neglected and failed to go to those counseling sessions with Mr. Cox. And as far as the concern over what charge was brought, our Air Force instruction that governs discipline in adverse actions permits a charge for refusal to obtain or successfully complete counseling or rehabilitation, and that is specifically what was referred to in his amended proposal to remove. He was on notice of what the misconduct was. There was no change in any standard in terms of a refusal. Now, it is true that the drug testing plan does say it is mandatory to initiate a removal when an individual refuses to pursue drug treatment. The Air Force Civilian and Disciplinary Actions Air Force instruction says refusal to obtain or successfully complete counseling or rehabilitation, the penalty for that is removal. Unlike other cases where questions have been raised about drug testing plans and procedures, those cases oftentimes involve the actual specimen collecting itself. And in the case where harmful error was found where an individual tried to challenge a removal from the drug program, which is the Baker case, this court found harmful error because the judge didn't even consider that argument. Mr. Wadous didn't challenge his discharge from Weber Human Services. He's never stated that he did not complete that program. The judge considered the evidence before her and considered his challenge to the plan, and she found substantial evidence supported that the Air Force had complied with its obligations. The finding of no harmful error should be sustained by this court. He did not provide any excuse for failing to complete treatment until he received the amended proposal to remove, at which time he said Weber had not been helpful to him. He hadn't said that before to a supervisor, to a supervisor who had, in fact, been responsive  about finding a treatment facility within the period permitted. The Air Force accommodated his concerns, gave him an additional 14 days, gave him time during the duty day without charging him leave to find a program. The Air Force met its obligations under the plan. I'd also like to note that the drug testing plan has what's called specific procedures for the drug testing plan, the drug testing program itself. However, there's nothing set forth in the drug testing plan that concerns procedures for referrals. So to the extent they're trying to say there's harmful error by the Air Force for failing to fulfill its procedures and doing a referral, those procedures are not defined in the plan. Referral plan is not defined in the plan. But they certainly need to be reasonable procedures, wouldn't you agree? If they're not defined, all the more reason why they would need to be reasonable procedures. Your Honor, I think it's reasonable that the plan says the Air Force is going to give you references and referrals so that you can get treatment to give you the head start you need for the second chance to be continuing as a federal employee. It's reasonable that the plan sets forth an agency and an office where you can meet with an individual and have your initial intake for an initial assessment and then be given a list. The Air Force says it's going to provide a helping hand, and it did that to Mr. Wadoops. It assessed him and it gave him the references he needed. The obligation was on him to complete a program, and he failed to do so. And the judge's finding that the Air Force substantially complied was not erroneous. It's important to recall as well that a removal action is important in a case where the well-being of individuals and multimillion-dollar aircraft are at risk and whose safety depends on an aircraft worker who is a rehabilitated drug user. An unrehabilitated methamphetamine user who makes disturbing comments about workplace violence does not belong in the military as a federal employee. We need a safe and secure environment for... We understand those issues. Yes, Your Honor. If there are no further questions... Any more questions? Thank you, Major Merrill. Thank you. Mr. Wadoops. Thank you. I think that one point that needs to be pointed out is rehabilitation programs can be anywhere from a couple of AA programs to six months of inpatient 24-hour surveillance and supervision and treatment. There's no way for any individual who's just an employee, who's a mechanic, to know which of these many things he can do. The Air Force, there's no way under the sun the Air Force would want their employees just to go out and sign up themselves for the lowest level of rehabilitation program if they were given that discretion. They wouldn't want that discretion. That wouldn't promote the efficiency of the service. That's why they withhold that discretion and put it in the person who's named as a SOCO in the Social Actions Office of people who can prescribe this, because otherwise you'd get manipulation from every employee in the entire Armed Forces. And the agency doesn't want that. But if the agency doesn't want that, it has to accept the reciprocal version of that, and the obverse is also true, that when an employee does not have discretion to choose his own stuff, he also is under no obligation to go out there and find his own thing and to pay money at the risk that he will go to this one, do 30 days, and they'll say, try again, or else your job is gone, because there's no reason that we have here why they would not have removed him if he had done a 30-day rehabilitation program and he'd come back and they would have said, that's not good enough, we're going to remove you. What's the principle? But it is very hard to see that what he did do was any sort of adequate rehabilitation program. Well, as a practical matter, I would tend to agree with you, and as an older brother in the situation, I certainly made that clear. But under my attorney relationship here, I don't think that that is relevant to the terms, because his obligation to perform only comes after they've already performed. And it's not just a mere legal distinction. I think you're right as a practical matter, but I think as a legal matter, you cannot impose these legal sanctions on the other people just because saying, that's not really good, we would have wanted more. Yes, but the law has to apply to everybody equally, whether he did it a little bad or a lot bad. He might be a lot bad, but even if it's a lot bad instead of just a little bad, they still didn't do their job, and that's a condition preceding. But his supervisor, Mr. Frost, notified him that he had to enroll in and fulfill all requirements for successful completion of a rehabilitation treatment program. And there's no dispute that he knew that he didn't do that at Weber. He walked out. He had subsequent appointments, which he skipped. So I'm having trouble, because you had notice, or he had notice, of what he was to do, and then he didn't do it. The debate there was between what Weber was going to provide and what it wasn't. In our opening brief at 32 and 33, we have letters. These letters constitute the only evidence presented by the agency in support of their claim that there was no program finished. And those letters say to the agency, listen, we've talked to him, we've met with him, we've worked with him, and we want to provide a program for him, but we don't know which one to provide for him. If you could please give us some assistance, we would appreciate it. Mr. Frost never responded to those letters. The AJ said, well, Dow and Frost did all they're supposed to do, and again, I agree they did do all they're obligated to do, but the agency itself, before it's authorized to remove, has to do more than just ignore a letter when they know that the employee doesn't have any understanding of what he's supposed to do, and that the program, actually the facility, doesn't have any idea of what program to send it to, provided the agency would notice. They just can't take advantage of that notice, ignore it, and then say, you know, use it as a gotcha. There should have been more done, but the fault of it all lies at the agency with not having the proper people there that are required by the plan. Does that answer your question? I still have a minute. Am I over? That means you're over, but is there anything else that you must tell us? No. Okay, thank you, Mr. Waters, and thank you, Major Merrill. The case is taken under submission.